| | | |
|---|---|---|
| **LESLIE E. KLINE, on her own behalf**<br>**and on behalf of J.T.W., a minor under the**<br>**age of eighteen, and JEFFERY A. KLINE,** | )<br>)<br>)<br>) | |
| Plaintiffs, | )<br>) | |
| **vs.** | )<br>) | **ORDER** |
| **CLEVELAND COUNTY, a local**<br>**government entity, et al.,** | )<br>)<br>)<br>) | |
| Defendants. | )<br>) | |

  **THIS MATTER** comes before the Court on four Motions to Dismiss. In their Amended

Complaint, Plaintiffs Leslie Kline—on her own behalf and on behalf of J.T.W., her minor child—

and Jeffrey Kline, her husband, allege that the Cleveland County Department of Social Services

("DSS"), its employees, and her ex-husband, Johnny White, unlawfully conspired to deprive them

of their constitutional right to familial privacy, violating federal law, as well as North Carolina's

Constitution and tort law. The Motions to Dismiss—filed by Cleveland County (Doc. No. 44), the

DSS employees in their individual capacities (Doc. Nos. 34, 38), and Johnny (Doc. No. 40)—

collectively assert that the claims are barred by immunity and that they fail to state a claim upon

which relief can be granted. They also contend that the Amended Complaint is a prohibited

shotgun pleading and that Leslie does not have legal capacity to proceed on behalf of her minor

child. After oral argument and several rounds of briefing, the motions are ripe for review. As

discussed below, Defendants' Motions to Dismiss are granted as to Plaintiffs' North Carolina

Constitution claims but denied as to Plaintiffs' remaining claims.

## I.  BACKGROUND

Plaintiffs filed their Amended Complaint against Defendants on August 27, 2019.  At this stage, the Court accepts as true the factual allegations contained therein—as well as in its integral, authentic attachments—drawing reasonable inferences in Plaintiffs' favor.  See Philips v. Pitt Cty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009).

Leslie and Johnny were married for about decade, spanning from about 1996 to 2006.  See Am. Compl. ¶ 27.  Over that time, the couple gave birth to three children, two of whom are central to this lawsuit: Bryan White and J.T.W.  See id. ¶ 28.  The first sign of trouble arose in May 2006, when Johnny filed for a divorce from bed and board, child custody, and a psychological evaluation of Leslie.  See id. ¶ 29.  Since then, the two have engaged in a protracted domestic and legal battle. The Amended Complaint copiously details—perhaps too much so—the custody dispute, id. ¶¶ 27–65, 234–303; Johnny's defiance of court orders, id. ¶¶ 40, 65, 72; and the minors' behavioral issues, id. ¶¶ 66–87.  The Court summarizes pertinent portions below.

On June 4, 2018, Bryan was staying at the Klines' home.  Sometime around four o'clock in the afternoon, he left without permission.  Bryan did not return by nine o'clock that evening, so the Klines called the police and reported him missing.  Shortly thereafter, officers found him hanging out at the local mall, as teenagers sometimes do.  When officers attempted to return Bryan to the Klines' home, he reported that Jeffrey, his stepfather, had hit him.  Officers rightly contacted DSS, which opened a child abuse and neglect investigation into the Klines.  See id. ¶ 83–90.

When the officers called DSS, they spoke with Defendant Nichole Allen, the attending child protective services social worker.  Allen responded to the Klines' home.  There, she interviewed the Klines, who informed her of the minors' behavioral problems.  Allen also spoke privately with J.T.W.  See id. ¶¶ 91–93.  At some point, Allen completed a Safety Assessment

Form, wherein she made two findings. See Doc. No. 17-13. First, she found indications that the minors' "caretaker caused and/or allowed serious physical harm to the children or made a plausible threat to cause serious physical harm in the current assessment." Id. at 1. The form provides several reasons that could be checked, but Allen did not check any of them. Rather, she wrote in a "comments" box that there were "allegations that [the] children have been slapped in the face and shoved against the wall." Id. Second, Allen found indications that the "caretaker does not meet the child's immediate needs for food or clothing." Id. at 2. Again, rather than checking a box, Allen wrote in the "comments" that there was a "disclosure that food is withheld from the children." Id. Neither Allen nor any other DSS employee removed the minors that night. Even so, the Klines allowed Bryan to spend the night with Johnny. See Am. Compl. ¶¶ 109–11.

The case was subsequently assigned to Defendant Debi Reece. Id. ¶ 113. On June 7, 2018, Leslie filed a Summons and Petition for Delinquency for the minors with the North Carolina Department of Juvenile Justice. Id. ¶ 130. That day, the Juvenile Court held a hearing, where the minors admitted to leaving the Klines' home without permission, being disrespectful, behaving in an undisciplined manner, and being regularly disobedient. Reece was present when these admissions were made. Id. ¶ 133–34. Based on these admissions, the Court found that the minors were undisciplined and placed them in the custody of DSS pending further review. See Doc. Nos. 17-16 at 2, 17-19 at 2. The Court also ordered that each parent had the right to visitation while the minors were in foster care. See Am. Compl. ¶ 169.

Both before and after the juvenile hearing, Reece investigated the allegations of child abuse. At some point, Reece concluded "there was no substantiation that she could make as to any abuse, neglect, or dependency on Plaintiffs' part." Id. ¶ 202. Reece "communicated her opinion to her supervisor, Defendant [Tamara] Hardin." Id. ¶ 203. Also, on July 3, 2018, Reece

purportedly visited Plaintiffs, informing them there was "'no evidence' of child abuse or neglect." Id. ¶ 218. Still, she forewarned that "there are politics involved" in the case. Id. ¶ 219. And, on or about July 25, 2018, Plaintiffs received a case decision letter—dated June 13, 2018—indicating the case was "closed as substantiated for neglect . . . due to [the minors] being placed in [DSS] custody through the [juvenile case]." Doc. No. 17-22. Despite her prior assurances that there was no evidence of abuse or neglect, Reece signed the decision. See id.

On August 24, 2019, the Klines wrote a letter to Defendant Karen Pritchard, then-Director of DSS, requesting a review of the decision. Id. ¶ 221. The Klines indicated they had "numerous recordings" making it "clear" that they had "never neglected or harmed [the minors]." Doc. No. 17-25 at 1. Even so, DSS "refus[ed] to listen to the records of the [minors] admitting that [they] would continue doing what they are doing until they get their way." Id. at 3. Pritchard responded that she had "reviewed the matter" and "support[ed] the case decision made." Doc. No. 17-26.

Several case management irregularities allegedly occurred over the course of the investigation. For example, Plaintiffs allege that DSS allowed "Defendant [Pam] Bright and Defendant [Christopher] Lee to continue working on Plaintiffs' case despite their prior friendly relationship with [Johnny] and [his] relatives." Am. Compl. ¶¶ 180, 184–85. DSS also allowed Johnny to independently control decisions regarding the children, including who would serve as the court-ordered parenting counselor. See id. ¶ 194. And just "days prior to the case decision lettering being mailed to Plaintiff, [Reece] received an email from [Johnny]." Id. ¶ 199.

Also, several decisional irregularities supposedly transpired during the investigation. First, according to Plaintiffs, DSS improperly commenced an investigation because Bryan's "allegation [of abuse] was not sufficient to trigger DSS'[s] authority to conduct an investigation." Id. ¶ 140. Second, although DSS was "aware" that the minors had "a propensity to lie" and that they had

"admitted to leaving [the Klines] home without permission, to being disrespectful to [the Klines], to behaving in an undisciplined manner, and to being regularly disobedient," and although the Klines made DSS "aware of several items of evidence contradicting the child abuse allegations[,] . . . DSS [still] refused to review or to consider" the contrary evidence. Id. ¶¶ 147–53, 161–63.

Beyond these irregularities, the Amended Complaint asserts that DSS violated Leslie's visitation rights. Specifically, even though Leslie had a court-ordered right to visitation while the minors were in DSS custody, DSS "never provided [her] with information about the foster mother" and "made no attempt to assist" her in visitation. Id. ¶¶ 169–72. Instead, Lee indicated that the minors "did not wish to see" her. Id. At the same time, DSS "approved" of Johnny "receiving additional visitation time that exceeded the visitation provided in the Court Order." Id. ¶ 177.

On September 19, 2018, the Juvenile Court's decision was reviewed, and DSS closed its case and terminated its involvement. See id. ¶¶ 227–28. Thereafter, Plaintiffs filed suit, alleging that, for about three months, "DSS was intimately involved in Plaintiffs' family affairs and repeatedly interfered with [the Klines'] rights to make decisions concerning the care, custody, and control of the [minors].'" Id. ¶ 230. Plaintiffs allege they suffered damages from Defendants' actions. First, they assert that Defendants "communicated and/or caused to be communicated to several third parties that [the Klines] were substantiated for child abuse and/or child neglect," which deprived the Klines of the opportunity to see Bryan in the emergency room, and which prevented the Klines from speaking with the minors' medical professionals. Id. ¶¶ 305, 309, 311. Second, Plaintiffs represent that Defendants' actions led to reputational damage and "financial damage due to additional legal fees, medical expenses, [and] lost wages." Id. ¶¶ 315, 318. Finally, Plaintiffs allege that Defendants actions have damaged the Klines' "relationships with the minor children . . . to the point of potentially being beyond repair." Id. ¶ 319.

## II.    DISCUSSION

Title 42, Section 1983 of the United States Code provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or any person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured."  42 U.S.C. § 1983.  Here, Plaintiffs allege they were deprived of their constitutional right to familial privacy.

"The sanctity of the family unit is a fundamental precept firmly ensconced in the Constitution and shielded by the Due Process Clause."  Hodge v. Jones, 31 F.3d 157, 163 (4th Cir. 1994).  Indeed, "'few rights' are 'more fundamental in and to our society than those of parents to retain custody over and care for their children, and to rear their children as they deem appropriate.'" D.B. v. Cardall, 826 F.3d 721, 740 (4th Cir. 2016) (citation omitted).  And, "just as parents possess a fundamental right with respect to their children, children also enjoy a 'familial right to be raised and nurtured by their parents.'"  Id. (citation omitted).

Generally, these familial privacy rights: (1) thwart governmental attempts to interfere with particularly intimate family decisions, and (2) void government actions that sever, alter, or otherwise affect the parent child relationship.  See Hodge, 31 F.3d at 163.  Even so, these rights are "neither absolute nor unqualified, and may be outweighed by a legitimate governmental interest."  Id. at 163–64.  Pertinent here, the Government has a "legitimate interest in curtailing the abuse and neglect of its minor citizens."  Id. at 163.  In other words, "the right to family integrity clearly does not include a constitutional right to be free from child abuse investigations."  Id. at 164 (quoting Watterson v. Page, 987 F.2d 1, 8 (1st Cir. 1993)).

In their Amended Complaint, Plaintiffs assert that DSS, its employees, and Johnny conspired to interfere with this right to familial privacy in three pertinent ways. First, Defendants allegedly "issued a case decision substantiating Plaintiffs for child abuse and/or neglect without any evidence and without any lawful basis." Am. Compl. ¶¶ 327–28. Second, Defendants supposedly "failed and refused to avoid conflicts of interest in investigating" and "intentionally declined to review [exculpatory] information . . . provided by Plaintiffs," thereby failing "to conduct a prompt, fair, and thorough investigation." Id. ¶¶ 331, 336, 341. Finally, Defendants purportedly "interfered with [Leslie's] visitation rights as they failed and refused to comply with court orders awarding [her] visitation." Id. ¶ 330.

In their four Motions to Dismiss, Defendants raise a host of common and distinct challenges to the Amended Complaint. Out of the gate, the DSS employees and Johnny maintain that Leslie should not be permitted to bring claims on behalf of J.T.W. See Doc. Nos. 38, 66. Johnny moves to dismiss the Amended Complaint as a "shotgun pleading," which fails to provide "a short and plain statement of the claim," violating Federal Rule of Civil Procedure 8. See Doc. No. 41. And both Cleveland County and the DSS employees assert this Court lacks subject matter jurisdiction to review this action, as Plaintiffs' claims are a collateral challenge to a state-court judgment, which is unreviewable under the Rooker-Feldman Doctrine. See Doc. Nos. 37, 45.

Assuming the Court moves beyond those preliminary matters, each Defendant has another failsafe to avoid reaching the merits. First, the DSS employees assert that the federal claims against them in their individual capacities are barred by absolute or qualified immunity. See Doc. No. 37. In turn, Cleveland County maintains there cannot be municipal liability under Section 1983, as Plaintiffs fail to sufficiently allege the requisite violative policy or practice. See Doc. No. 45. And

Johnny argues that the Section 1983 claim against him must fail because the allegations against him amount to private conduct, not the requisite state action. See Doc. No. 41.

If Plaintiffs' claims somehow survive these objections, Defendants collectively maintain that the claims fail to state a claim upon which relief can be granted. As to the Section 1983 claims, Defendants maintain that the facts do not give rise to a substantive or procedural due process violation. See Doc. Nos. 37, 41, 45. As to Plaintiffs' state tort claims, Cleveland County and the DSS employees again allege they are entitled to immunity—this time, under state law. See Doc. Nos. 37, 45. Finally, Defendants allege that the state constitutional claims must fail, as there are other adequate remedies at law. See Doc. Nos. 37, 45.

The Court has considered this bevy of arguments. While the Court agrees that the federal constitutional claims must be narrowed, and the state constitutional claims must be dismissed, Defendants' contentions do not warrant wholesale dismissal. Plaintiffs will have a steep hill to climb at summary judgment, but for now, Defendants' Motions to Dismiss are denied in part.

### A.  Standard of Review

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges a court's authority to hear the subject matter brought by a complaint. See Friends of Lubavitch v. Baltimore Cty., 421 F. Supp. 3d 146, 160 (D. Md. 2019). The burden of establishing subject matter jurisdiction rests with the plaintiff. Demetres v. E. W. Const., Inc., 776 F.3d 271, 272 (4th Cir. 2015). The motion should be granted if, after engaging in necessary fact-finding, the court determines that the movant is entitled to judgment as a matter of law. Id.

By contrast, a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. See In re Birmingham, 846 F.3d 88, 92 (4th Cir.), as amended (Jan. 20, 2017), cert. denied, 138 S. Ct. 468 (2017). To survive such a motion, the complaint must

contain sufficient allegations "to raise a right to relief above the speculative level, thereby nudging its claims across the line from conceivable to plausible." Vitol, S.A. v. Primerose Shipping Co., 708 F.3d 527, 543 (4th Cir. 2013) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

When ruling on a motion to dismiss, the Court considers "the complaint in its entirety, as well as documents attached or incorporated into the complaint." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011) (citation omitted). The Court "must accept as true all of the factual allegations contained in the complaint" and draw "all reasonable inferences" in favor of the non-movant. Id.[1] Even so, factual allegations are insufficient if they rely on "naked assertions" and "unadorned conclusory allegations" that are "devoid of factual enhancement." In re Birmingham, 846 F.3d at 92. And "the Court is not obliged to assume the veracity of the legal conclusions drawn from the facts alleged." Id.

## B.    Legal Capacity

North Carolina Rule of Civil Procedure 17 determines who has capacity to sue within North Carolina courts. It also provides "standards and procedures for the appointment of a next friend or guardian ad litem." Genesco, Inc. v. Cone Mills Corp., 604 F.2d 281, 285–86 (4th Cir. 1979). According to the DSS employees, those guardian ad litem procedures are stringent, prohibiting parents from automatically representing their minors in state courts. See Doc. No. 39 at 2–3.

---

[1] Defendants attempt at several points to offer evidence contrary to the Amended Complaint and its integral attachments. For example, in an affidavit, Pritchard averred that "neither Leslie Kline nor Jeffrey Kline were determined to be responsible for abuse or serious neglect, and neither were placed on the Responsible Individuals List." Doc. No. 34-2 ¶ 7. The DSS employees also assert that no due process deprivation actually occurred. See Doc. No. 37 at 15–19. If Plaintiffs fail to adduce contrary evidence, this will make short work of the case at summary judgment. But at this point, the Court must accept as true Plaintiffs' allegations. The Court thus declines to consider Defendants' contested and contrary factual assertions at this juncture.

Consequently, J.T.W.'s claims should be dismissed under Federal Rule of Civil Procedure 12(b)(1), as Leslie "is without capacity and standing" to bring claims of J.T.W.'s behalf.  Id. at 2.

The DSS employees' reading of North Carolina Rule 17 is perplexing at best.  By its terms, North Carolina Rule 17(b)(1) explains that a minor "must appear by general or testamentary guardian . . . or by guardian ad litem."  This disjunctive understanding—i.e., that a minor can be represented by either a general guardian or a guardian ad litem—is prevalent throughout North Carolina case law.  See, e.g., Gaskins v. McCotter, 278 S.E.2d 302, 305 (N.C. Ct. App. 1981) (recognizing that a state superior court "manifestly had authority to substitute the general guardian or trustee as party plaintiff for the guardian ad litem").

Even if the DSS employees' reading is correct, they have nevertheless failed to explain why North Carolina's state procedural rule would govern a federal cause of action.  Charitably, the Court will assume that the DSS employees are relying on Federal Rule of Civil Procedure 17(b), which provides that "capacity to sue or be sued is determined . . . for an individual who is not acting in a representative capacity, by the law of the individual's domicile."  Rule 17(c) clarifies any ambiguity that the prior subsection creates, explaining that "a general guardian" is a "representative [that] may sue or defend on behalf of a minor or an incompetent person."  Put simply, Rule 17(b) looks to state law to determine who has the capacity to sue on their own behalf, while Rule 17(c) creates a federal procedural rule to determine who may serve as a representative for a person lacking such capacity.  See Williams v. Rickman, 759 F. App'x 849, 851 (11th Cir. 2019); Graham v. Teller Cty., 632 F. App'x 461, 465 (10th Cir. 2015); Thomas v. Humfield, 916 F.2d 1032, 1035 (5th Cir. 1990); see also Gibbs v. Carnival Cruise Lines, 314 F.3d 125, 135–36 (3d Cir. 2002) (explaining federal courts "need not look to the state law" in determining who may serve as representative for a person lacking capacity to sue); Genesco, 604 F.2d at 285 (recognizing

there is "no special appointment process" for choosing a representative in federal court). Because Leslie is undisputedly one of J.T.W.'s general guardians,[2] she is authorized to sue on his behalf.

Regardless, if the Court were required to appoint a guardian ad litem, it would appoint Leslie here. As the DSS employees acknowledge, a representative must protect the minor's "rights and interests in" the particular action. Doc. No. 39 at 3. Leslie is uniquely situated to vindicate J.T.W.'s "right to be raised and nurtured" by his mother. Cardall, 826 F.3d at 740.

Accordingly, the Motion to Dismiss J.T.W.'s claims for lack of capacity is denied, and Leslie is authorized to serve as J.T.W.'s representative in this action.

### C.    Shotgun Pleading

Federal Rule of Civil Procedure 8(a) requires a civil complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Therefore, courts disfavor complaints that are "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action." Weiland v. Palm Beach Cty. Sheriff's Office, 792 F.3d 1313, 1322 (11th Cir. 2015); see Parks v. Bos. Sci. Corp., No. 5:17-CV-200, 2018 WL 1040103, at *2 (W.D.N.C. Feb. 23, 2018). In fact, dismissal for violating this rule may be appropriate where "it is virtually impossible to know which allegations of fact are intended to support which claim(s) for relief." Weiland, 792 F.3d at 1325 (emphasis in original) (citation omitted).

Here, Johnny argues that the Amended Complaint, which "consists of 78 pages, 463 numbered paragraphs, 14 separate causes of action and references/attaches 35 numbered exhibits and sub-exhibits consisting of 154 additional pages" is effectively a "shotgun pleading, . . . which

---

[2] Although Johnny maintains primary physical custody of J.T.W., the parents exercise joint legal custody and Leslie maintains weekend custody of J.T.W. See Doc. No. 17-30 at 6. Defendants have not suggested that this arrangement deprives Leslie of the right to sue on J.T.W.'s behalf. And the Court finds it does not. See Black's Law Dictionary (10th ed. 2014) (defining a "general guardian" as one "who has general care and control of the ward's person and estate").

so tries the analytical resources of the Court as to ultimately require the Court to engage in lawyering for the pleader." Doc. No. 41 at 5. Thus, Johnny reasons, the Court should dismiss the Amended Complaint under Rule 8 or at least require Plaintiffs to provide a more definite statement.

Although the Amended Complaint is unnecessarily lengthy and sometimes superfluous, neither dismissal nor a more definite statement is warranted under Rule 8. As the Court explained above, Plaintiffs essentially claim that Defendants violated their constitutional rights to familial privacy by: (1) refusing to consider exculpatory information and to avoid conflicts of interest while conducting a child neglect investigation; (2) substantiating claims of child abuse and neglect without any lawful basis; and (3) interfering with Leslie's right to court-ordered visitation. See Am. Compl. ¶¶ 327–28, 330–31, 336, 341. Much of the detail provided by Plaintiffs can be fairly cast as context that the DSS should have considered when making decisions. In a pleading system that dismisses complaints for having too little "factual enhancement," see Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), the Court declines to punish Plaintiffs for providing too much context.

### D.  Rooker-Feldman Doctrine

Among federal courts, only the Supreme Court is vested with authority to exercise appellate jurisdiction over state-court judgments. See Hulsey v. Cisa, 947 F.3d 246, 249 (4th Cir. 2020) (citing 28 U.S.C. § 1257(a)). The Rooker-Feldman Doctrine embodies that rule by precluding lower federal courts from exercising jurisdiction over final state-court judgments. See Thana v. Bd. of License Comm'rs for Charles Cty., 827 F.3d 314, 319 (4th Cir. 2016). Still, that doctrine is "narrow and focused." Id. It is "confined to . . . cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284 (2005).

Here, the DSS employees and Cleveland County each assert that the <u>Rooker-Feldman</u> Doctrine bars Plaintiffs' claims. According to them, Plaintiffs' federal claims are "an attempt to collaterally attack the orders of the state court, as [they are] inexplicably intertwined with the state court order concerning placing [the minors] in the legal custody and care of DSS." Doc. Nos. 37 at 21, 45 at 18. But construing the allegations in the light most favorable to Plaintiffs, the Amended Complaint does not fit within <u>Rooker-Feldman</u>'s narrow confines.

In the Amended Complaint, Plaintiffs do not allege injuries arising from the state-court judgment. Rather, their injuries arise from Defendants' alleged refused to consider exculpatory information, substantiation of child abuse and neglect without any lawful basis, and interference with Leslie's right to court-ordered visitation. To be sure, Defendants' alleged actions are related to the Juvenile Court's decision to grant Leslie Kline visitation rights and to grant DSS custody of the children. But an injury can be "'ratified, acquiesced in, or left unpunished by' a state-court decision without being 'produced by' the state-court judgment." <u>Hulsey</u>, 947 F.3d at 250 (citation omitted). Because Plaintiffs' alleged injuries were produced by Defendants' actions—and not a state-court judgment—the <u>Rooker-Feldman</u> Doctrine is inapposite. <u>See</u> <u>id.</u>

### E.     Official Immunity

The DSS employees next assert that Plaintiffs' federal claims are barred by absolute immunity or, alternatively, qualified immunity. <u>See</u> Doc. No. 37. Each is addressed in turn.

####     i.     Absolute Immunity

As the name suggests, absolute immunity "acts as a complete bar to damages claims of any sort, constitutional or otherwise." <u>Goldstein v. Moatz</u>, 364 F.3d 205, 212 (4th Cir. 2004). Because it is a blunt instrument, "courts are obliged to apply absolute immunity sparingly." <u>Id.</u> In general,

"the presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." Burns v. Reed, 500 U.S. 478, 486–87 (1991).

Regardless, it is well-settled that "prosecutors are absolutely immune from [Section] 1983 actions for conduct occurring within the scope of their duties in initiating and pursuing a criminal prosecution." Vosburg v. Dep't of Soc. Servs., 884 F.2d 133, 135 (4th Cir. 1989). Courts provide such immunity "not to protect an erring official, but to insulate the decisionmaking process from the harassment of prospective litigation." Goldstein, 36 F.3d at 212 (quoting Westfall v. Erwin, 484 U.S. 292, 295 (1988)). Like prosecutors, "a social worker must exercise her best judgment and discretion in deciding" whether to commence "judicial proceedings against the parent or guardian of a minor child." Vosburg, 884 F.2d at 137. Courts thus afford absolute immunity to social workers for "those activities . . . that could be deemed prosecutorial." Id. Still, absolute immunity does not extend to non-prosecutorial conduct, such as "investigating the possibility" of commencing judicial proceedings. Id.; see Evans v. Perry, 578 F. App'x 229, 232 (4th Cir. 2014). Rather, social workers investigating child abuse may assert qualified immunity where appropriate. See Renn By & Through Renn v. Garrison, 100 F.3d 344, 349 (4th Cir. 1996).

As the Supreme Court has explained, the line separating "investigative" and "prosecutorial" conduct is elusive, as almost any investigative action "could be said to be in some way related to the ultimate decision whether to prosecute." Burns v. Reed, 500 U.S. 478, 495 (1991). To delineate the two, the key consideration is whether the action is "closely associated with the judicial process." Id. Actions taken "prior to a . . . determination" to pursue judicial action are protected by qualified immunity, while actions taken in the "judicial phase" are protected by absolute immunity. Goldstein, 364 F.3d at 214.

Stein v. Disciplinary Board of the New Mexico Supreme Court is analogous to the case at hand. See 520 F.3d 1183 (10th Cir. 2008). There, the attorneys-plaintiffs sued disciplinary counsel for filing "an unsupported ethical complaint . . . without adequate investigation" after "becoming overly friendly with the complainant." Id. at 1193–94. The Tenth Circuit held that the counsel was entitled to absolute immunity on those facts. Reviewing the complaint, the Court found it clear that "any failure-to-investigate claim against disciplinary counsel [actually] amounts to a claim that they should not have exercised their discretion to bring charges without obtaining more information." Id. at 1194. In so ruling, the Court noted that the plaintiffs "made no allegation that the disciplinary counsel in their investigative capacities committed any act that would prevent them, in their prosecutorial capacities, from making a fully informed decision about whether the evidence already obtained was adequate to justify bringing charges." Id.

Similarly, in this case, at least some of the allegations in Plaintiffs' Amended Complaint would give rise to absolute immunity. For example, to the extent that Plaintiffs' claims could be construed as a simple disagreement with how DSS weighed the evidence before substantiating for neglect and/or abuse, that decision would be protected by absolute immunity because it at the heart of social workers' discretion. Making the "decision to substantiate or not can have far-reaching implications for children and families, and is not something that can be taken lightly." Renn, 100 F.3d at 351. Absolute immunity ensures that social workers are not punished with litigation after weighing the evidence and deciding to proactively protect potentially abused children.

At the same time, at least some of Plaintiffs' allegations are investigative in nature and thus clearly outside the bounds of absolute immunity. For example, Plaintiffs allege that Defendants "refused to avoid conflicts of interest in investigating" and "intentionally declined to review [exculpatory] information . . . provided by Plaintiffs," thereby failing "to conduct a prompt, fair,

and thorough investigation." Am. Compl. ¶¶ 327–28. While these investigative wrongdoings may have affected the subsequent substantiation decision, they nevertheless occurred prior to the substantiation decision. See Stein, 520 F.3d at 1194. Likewise, DSS's alleged refusal to "comply with court orders awarding Plaintiff Leslie Kline visitation" is unrelated to the substantiation decision. See Am. Compl. ¶ 330. For these claims, absolute immunity does not apply.

      ii.    Qualified Immunity

While DSS Defendants are not entitled to absolute immunity for alleged investigative wrongdoing, they may nevertheless be entitled to qualified immunity. See Renn, 100 F.3d at 349. The doctrine of qualified immunity renders government officials immune from suit where their conduct does not clearly violate established statutory or constitutional rights. See Pearson v. Callahan, 555 U.S. 223, 231–32 (2009). In so doing, the doctrine seeks to balance two important interests: the need to hold public official accountable when they fail to act irresponsibly, and the need to shield officials from litigious harassment when they do act responsibly. See id.

Because qualified immunity is "an immunity from suit rather than a mere defense to liability," courts must resolve immunity questions at "the earliest possible stage in litigation" and, preferably, "prior to discovery." Id. Generally, the public official is granted immunity unless: (1) the facts as alleged or shown make out a violation of a constitutional right, and (2) the right was clearly established at the time of the purported misconduct. See Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs., 597 F.3d 163, 169 (4th Cir. 2010) (citing Pearson, 555 U.S. at 232). A right is "clearly established" when "'a reasonable official would understand that what he [or she] is doing violates' the right in question". Waterman v. Batton, 393 F.3d 471, 476 (4th Cir. 2005) (citation omitted). While "the exact conduct at issue need not have been held unlawful in order for the law governing an officer's actions to be clearly established, the existing authority must be such that

the unlawfulness of the conduct is manifest." Id.; see Hope v. Pelzer, 536 U.S. 730, 741 (2002) (explaining "officials can be on notice that their conduct violates established law even in novel factual situations"); Brockington v. Boykins, 637 F.3d 503, 508 (4th Cir. 2011) (same).

As noted above, Defendants have two viable claims that are not barred by absolute immunity. First, Defendants "failed and refused to avoid conflicts of interest in investigating" and "intentionally declined to review [exculpatory] information . . . provided by Plaintiffs," thereby failing "to conduct a prompt, fair, and thorough investigation." Am. Compl. ¶¶ 327–28. Second, Defendants intentionally interfered with Leslie's court-ordered right to visitation. Id. ¶ 330. The Court discusses the merits of these claims in further detail below. See infra Part II.H. For now, it suffices to say that, at the time of the alleged violation, a reasonable official would have recognized that Plaintiffs had clearly established constitutional rights to have DSS consider exculpatory evidence prior to substantiating the Klines for abuse and neglect. See infra Part II.H. Qualified immunity cannot stand as a barrier prohibiting that aspect of Plaintiffs' claims.

### F. Municipal Liability

Unlike public officials, municipalities do not enjoy absolute or qualified immunity. See Owens v. Baltimore City State's Attorneys Office, 767 F.3d 379, 402 (4th Cir. 2014). Even so, a municipality "cannot be held liable solely because it employs a tortfeasor." Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 691 (1978) (emphasis in original). Instead, "a municipality is liable only for its own illegal acts." Owens, 767 F.3d at 402 (emphasis in original). The municipality can "be said to have committed an independent act" where it "subscribes to a custom, policy, or practice" "by which local officials violate a plaintiff's constitutional rights." Id.

Although municipal liability attaches only to "official municipal policy of some nature," those policies need not be embodied in "formal ordinances." Hunter v. Town of Mocksville, 897

F.3d 538, 554 (4th Cir. 2018).  This rule embraces the reality that decisionmakers "frequently choose[] a course of action tailored to a particular situation and not intended to control decisions in later decisions."  Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986).  Therefore, "where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or repeatedly."  Id.  The touchstone for such municipal liability is whether "the decisionmaker possesses final authority to establish municipal policy with respect to the [specific] action ordered."  Hunter, 897 F.3d at 554 (quoting Liverman v. City of Petersburg, 844 F.3d 400, 413 (4th Cir. 2016)).  If so, the decisionmaker's ratification "can fairly be attributed as reflecting municipal policy."  Id.

In the Amended Complaint, the Klines allege they contacted Pritchard and informed her that DSS refused to consider the "numerous recordings" which made "clear" that Plaintiffs "never neglected or harmed the minors."  Doc. No. 17-25 at 1.  Pritchard responded that she "reviewed the matter" and "support[ed] the case decision made."  Doc. No. 17-26 at 1.  Plaintiffs allege that "Pritchard, as Director of DSS, had final policymaking authority for DSS, and therefore, her actions in either directing or approving of her employees' conduct represent [the] official policy of DSS."  Am. Compl. ¶ 353.  Plaintiffs also allege she "had actual or constructive knowledge" of this misconduct of his subordinates.  Id. ¶ 356.

In its Motion to Dismiss, Cleveland County does not dispute that Pritchard had final decision-making authority with respect to Plaintiffs' child abuse investigation.  See Doc. No. 45 at 11–13.  Rather, Cleveland County asserts that these facts are "conclusory" and fail to "allege any official policy or custom."  Id. at 13.  Construing the Amended Complaint in the light most favorable to Plaintiffs, the Court disagrees.  Here, Plaintiffs allege they submitted evidence to DSS emphatically showing they did not abuse the minors, yet DSS refused to consider it.  Pritchard was

informed of the alleged investigative misconduct as the final policymaking official. Nevertheless, she "support[ed] the case decision" made by DSS.[3] These facts suffice for municipal liability.

### G. State Action

To establish a claim under Section 1983, a plaintiff must prove that the defendant (1) deprived them "of a right secured by the Constitution and laws of the United States," and (2) "that the deprivation was performed under color of the referenced sources of state law found in the statute." Philips, 572 F.3d at 180. The color-of-law element reflects the fact that "most rights secured by the Constitution are protected only against infringement by governments." Flagg Bros. v. Brooks, 436 U.S. 149, 156 (1978); accord Mentavlos v. Anderson, 249 F.3d 301, 310 (4th Cir. 2001). It "avoids imposing on the State, its agencies, or officials, responsibility for conduct for which they cannot fairly be blamed." Lugar v. Edmondson Oil Co., 457 U.S. 922, 936 (1982). And it ensures the Constitution is a "shield that protects private citizens from the excesses of government, rather than a sword that they may use to impose liability upon one another." Holly v. Scott, 434 F.3d 287, 292 (4th Cir. 2006). Thus, "merely private conduct, no matter how discriminatory or wrongful," fails to satisfy the color-of-law element. Philips, 572 F.3d at 181.

Still, in some circumstances, "the deed of an ostensibly private organization or individual" may be treated "as if a State has caused it to be performed." Mentavlos, 249 F.3d at 310 (quoting Brentwood Academy v. Tennessee Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001)). Specifically, ostensibly private actions "will be deemed to satisfy the color-of-law" element where

---

[3] For the same reason, the Court disagrees with Pritchard's assertion that she is simply being sued for "fail[ing] to overturn the decision" of her subordinates. Doc. No. 37 at 11. Construing facts in the light most favorable to Plaintiffs, they allege that Pritchard willfully participated in a decision to substantiate Plaintiffs for abuse and/or neglect, while entirely refusing to consider exculpatory evidence. These facts violate Plaintiffs' due process rights. See infra Part II.H.

"the conduct allegedly causing the deprivation of a federal right [can] be fairly attributable to the State." Philips, 572 F.3d at 181 (quoting Holly, 434 F.3d at 292).

Here, Johnny contends that Plaintiffs' Section 1983 claims against him should be dismissed because there is "not one single factual allegation" suggesting he acted in concert with Cleveland County. Doc. No. 41 at 13. Plaintiffs respond by pointing out that the Amended Complaint alleges that Johnny "maintained a social relationship with several Cleveland County DSS employees." Am. Compl. ¶ 181. Likewise, DSS Defendants allowed Johnny to independently control decisions regarding the children, including who would operate as the court-ordered parenting counselor. Id. ¶ 194. And, just days before mailing the neglect and/or abuse decision to Plaintiffs, Reece "received an email from [Johnny]." Id. ¶ 199. Finally, Plaintiffs alleged that the "DSS Defendants were in a sufficiently close relationship with [Johnny] such that [he] was acting under color of state law in depriving Plaintiffs of their substantive due process rights." Id. ¶ 355.

In reply, Johnny contends these facts "suggest only the possibility of a cooperative relationship between [Johnny] and the other Defendants, not concerted action." Doc. No. 55 at 7 (emphasis in original). Ultimately, discovery may reveal that Johnny played absolutely no role in the child abuse investigation conducted by DSS. But construing the facts in the light most favorable to Plaintiffs, these allegations plausibly suggest that Johnny may have coordinated with DSS to accomplish the allegedly wrongful substantiation decision and the deprivations that resulted therefrom. See Philips, 572 F.3d at 184.

### H.     Federal Due Process

The Fourteenth Amendment of the United States Constitution provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. Due process includes both substantive and procedural components. See Snider Int'l

Corp. v. Town of Forest Heights, 739 F.3d 140, 145 (4th Cir. 2014). While often discussed in tandem, they are distinct and should not be conflated. See id. (citing Zinerman v. Burch, 494 U.S. 113, 125–26 (1990)); see also Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985). The Court discusses each component in turn.

i.     Procedural Due Process

Procedural due process "provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures." Loudermill, 470 U.S. at 541. At a minimum, the "basic requirements" of procedural due process are "only that the complaining party receive notice of the reasons for the deprivation, an explanation of the evidence against [them], and 'an opportunity to present [their] side of the story.'" Cardall, 826 F.3d at 743 (citing Loudermill, 470 U.S. at 532). Beyond these guarantees, courts balance three factors to determine what process is due: "(1) the nature of the private interest that will be affected, (2) the comparative risk of an erroneous deprivation of that interest with and without additional or substitute procedural safeguards, and (3) the nature and magnitude of any countervailing interest in not providing additional or substitute procedural requirements." Cardall, 826 F.3d at 742–43 (4th Cir. 2016) (citing Mathews v. Eldridge, 424 U.S. 319, 335 (1976)).

In a similar case, Wolf v. Faquier County, the Fourth Circuit rejected a mother's procedural due process claim against a social services department where the mother simply identified several ways where the "investigation could have been better handled and more quickly resolved." 555 F.3d 311, 322 (4th Cir. 2009). The Court acknowledged that the abuse investigation may have been imperfect. See id. at 323. Even so, the mother "was not denied the right to be heard," and "the DSS employees went out of their way to try to interview and otherwise obtain information

[from the mother] about the safety of [her] children." Id. The Court thus found that the mother was not denied the "minimum safeguards required by procedural due process." Id. at 322–23.

Unlike in Wolf, Plaintiffs here do not contend that DSS was merely negligent in its investigation. Rather, they allege that DSS "failed and refused to avoid conflicts of interest" and "intentionally declined to review [exculpatory] information . . . provided by Plaintiffs," thereby intentionally failing "to conduct a prompt, fair, and thorough investigation" of the alleged child neglect and/or abuse. Am Compl. ¶¶ 331, 336, 341. In other words, Plaintiffs claim they were denied the "minimum safeguards" that are guaranteed by procedural due process[4] and that were protected in Wolf. See 555 F.3d at 322–23; Evans, 578 F. App'x at 232 (same).[5]

Plaintiffs have less success with their procedural due process claim that DSS refused to comply with Leslie's court-ordered visitation rights. Courts have recognized that, where DSS attains legal custody of a child and a parent maintains visitation rights, then the parent is afforded adequate procedural due process where they can invoke state post-deprivation procedures to vindicate their visitation right. See Weller v. Dep't of Soc. Servs. for City of Baltimore, 901 F.2d 387, 394 (4th Cir. 1990); accord Brittain v. Hansen, 451 F.3d 982, 1000 (9th Cir. 2006); Zakrzewski v. Fox, 87 F.3d 1011, 1014 (8th Cir. 1996); Wise v. Bravo, 666 F.2d 1328, 1333 (10th Cir. 1981). This rule ensures the Due Process Clause does not become a "vehicle to resolve [every]

---

[4] Defendants are correct that "if state law grants more procedural rights than the Constitution would otherwise require, a state's failure to abide by that law is not a federal due process issue." Riccio v. City of Fairfax, 907 F.2d 1459, 1469 (4th Cir. 1990); see Doc. Nos. 37 at 19, 45 at 13–14. Still, as discussed above, Plaintiffs allege "the deprivation of a [constitutionally] protectable interest" and thus a violation of the "federal standard of what process is due." Id.

[5] Defendants Hardin and Bright assert they were acting solely in a "supervisory" capacity and thus should not be held liable for the "unconstitutional acts of their subordinates." Doc. No. 37 at 10. Again, viewing the facts in the light most favorable to Plaintiffs, the Amended Complaint asserts that Hardin and Bright willfully participated in a concerted effort to deprive Plaintiffs of a prompt, fair, and thorough investigation. See Am. Compl. ¶¶ 184–85, 203.

dispute involving visitation rights-privileges." <u>Wise</u>, 666 F.2d at 1333; <u>accord</u> <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 848 (1998) (recognizing the Due Process Clause "is not a 'font of tort law to be superimposed upon whatever systems may already be administered by the States'" (quoting <u>Paul v. Davis</u>, 424 U.S. 693, 701 (1976))). It also fits with the general recognition that, while parents retain a liberty interest in visitation rights, "due process is flexible and calls for such procedural protections as the particular situation demands." <u>Weller</u>, 901 F.2d at 394 (quoting <u>Morrissey v. Brewer</u>, 408 U.S. 471, 481 (1972)).

North Carolina law provides procedures that would have allowed Leslie to enforce her visitation rights. For example, she could have returned to the Court and asked for the visitation order to be more specific. <u>Hancock v. Hancock</u>, 471 S.E.2d 415, 419–20 (N.C. Ct. App. 1996). If the visitation order was sufficiently specific and DSS nevertheless willfully violated that order, she could have moved for them to be held in contempt. <u>See id.</u> And, if the problem was that the minors refused to visit his mother—as Lee's alleged comments seem to indicate, <u>see</u> Am. Compl. ¶¶ 169–72—then Leslie could have asked for an order "forcing [them] to visit the noncustodial parent." <u>Mintz v. Mintz</u> 307 S.E.2d 391, 394 (N.C. Ct. App. 1983). The Amended Complaint contains no suggestion that Leslie attempted to utilize these procedures or that they would be futile. And, indeed, the state courts were alleged to have ruled favorably for Leslie on several occasions. <u>See, e.g.,</u> Am. Compl. ¶¶ 147–53. Because North Carolina provided adequate procedures to vindicate Leslie's visitations rights, the procedural due process claims fail on that front.

ii. <u>Substantive Due Process</u>

Substantive due process is far narrower than its procedural complement. <u>See</u> <u>Cardall</u>, 826 F.3d at 740. This is because substantive due process bars government actions "<u>regardless</u> of the fairness of the procedures used to implement them." <u>Daniels v. Williams</u>, 474 U.S. 327, 331

(1986) (emphasis added). Courts have identified two aspects of substantive due process. The first protects rights that are "fundamental," whereas the second "protects against the exercise of governmental power that shocks the conscience." Cardall, 826 F.3d at 740 (citation omitted).

As noted, while not unqualified, Plaintiffs have a fundamental right to familial privacy. See, e.g., Hodge, 31 F.3d at 163–64. DSS investigative conduct implicating that right can amount to an "abuse of power which 'shocks the conscience' [and which] creates a substantive due process violation." Wolf, 555 F.3d at 323. The conscience-shocking test is stringent, as it prohibits "only the most egregious official conduct." Slaughter v. Mayor & City Council of Baltimore, 682 F.3d 317, 321 (4th Cir. 2012) (quoting Lewis, 523 U.S. at, 846). The conduct must be purposefully "abusive or oppressive," lacking "justification by any government interest." Hawkins v. Freeman, 195 F.3d 732, 744 (4th Cir. 1999); see Lewis, 523 U.S. at 855 (explaining the conscience-shocking test turns on the degree of fault of the official). Negligently inflicted harm is "categorically" insufficient to meet this standard. Lewis, 523 U.S. at 849.

As discussed, at least some of Plaintiffs' claims could be construed as a simple disagreement with how DSS weighed the evidence before it substantiated for neglect and/or abuse. See supra Part II.E.i. Courts have held that such allegations do not shock the conscience, as they are at least "based on some evidence of child abuse." Weller, 901 F.2d at 391; accord Folkerts v. City of Waverly, 707 F.3d 975, 981 (8th Cir. 2013) (recognizing "a negligent failure to investigate inconsistencies or other leads does not violate due process").

By contrast, some of Plaintiffs' other allegations go far beyond disagreeing with how DSS weighed the evidence before it. Specifically, Plaintiffs allege that DSS and its employees "failed and refused to avoid conflicts of interest in investigating" and "intentionally declined to review [exculpatory] information . . . provided by Plaintiffs," thereby failing "to conduct a prompt, fair,

and thorough investigation." Am. Compl. ¶¶ 331, 336, 341. In effect, Plaintiffs are alleging that Defendants were acting to separate their family, regardless of whether the evidence actually demonstrated that the Klines abused or neglected the minor children. Such facts, if true, would certainly amount to an arbitrary and oppressive exercise of power amounting to a substantive due process violation. See Folkerts, 707 F.3d at 981 (holding that "investigators shock the conscience when they . . . purposefully ignore evidence of [an individual]'s innocence"); see also Russo v. City of Bridgeport, 479 F.3d 196, 210 (2d Cir. 2007) (holding that a "failure to investigate [supposedly exculpatory evidence] to see if [it] was in fact exculpatory would readily support a jury finding of either intentional violation of, or deliberate indifference to, [plaintiff]'s constitutional rights"); Cannon v. Macon Cty., 1 F.3d 1558, 1564 (11th Cir. 1993) (holding Defendant's "failure to take any [investigative] steps" to determine whether plaintiff was a "wanted fugitive" was sufficient to raise a question of fact as to his deliberate indifference toward the plaintiff's due process rights"), opinion modified on reh'g, 15 F.3d 1022 (11th Cir. 1994); Hash v. Johnson, 845 F. Supp. 2d 711, 752 (W.D. Va. 2012) (same).

Regarding interference with Leslie's court-ordered visitation rights, Plaintiffs' substantive due process claim fails for much the same reason as her procedural due process claim. When Leslie asked to see the minors, Defendant Lee "responded that the Minor Children did not wish to see [her]." Am. Compl. ¶ 172. There is not even an intimation that this is a lie, and the Amended Complaint is replete with allegations supporting that statement. See, e.g., id. ¶¶ 231–65 (recounting several occasions where the minors "abscond[ed]" to avoid returning to the Klines); 280r (noting the minors "attempt[ed] to get the [custody] order changed so they could live with [their] father"), 340a (same). As discussed, under North Carolina law, "[w]here, as here, the custodial [guardian] does not prevent visitation but takes no action to force visitation when the

child refuses to go, the proper method is for the noncustodial parent to ask the court to modify the order to compel visitation." Hancock, 471 S.E.2d at 420. Leslie does not suggest that she invoked this process. Put simply, DSS employees do not shock the conscience by "misinterpret[ing] their obligations under a court order while addressing" a "difficult situation" involving a "contentious custody dispute" and "court-ordered visitation that the children apparently were unwilling to attend." Schmidt v. Des Moines Pub. Sch., 655 F.3d 811, 817 (8th Cir. 2011).

## I.      State Law Claims

Beyond Plaintiffs' Section 1983 claims, Plaintiffs also asserted several claims under state law. See Am. Compl. ¶¶ 367–445. First, they raised several tort law claims, including defamation and abuse of process. Id. ¶¶ 378–447. They also alleged violations of Article I, Section 19 of the North Carolina Constitution. Id. ¶¶ 367–377. Cleveland County and the DSS employees assert that these tort and constitutional claims should be dismissed.[6] As discussed below, the Court shall dismiss the state constitutional claims, but declines to dismiss the tort claims at this time.

### i.      North Carolina Tort Claims

To begin, the DSS employees and Cleveland County each maintain that the claims against them are barred by state immunity doctrines. The DSS employees briefly argue that the North Carolina doctrine of public official immunity bars the individual capacity claims against them. In so arguing, the employees acknowledge that "the analysis for public official[] immunity is the same as for qualified immunity." Doc. No. 37 at 23. Because Plaintiffs' Amended Complaint

---

[6] Johnny asserted that the Court should exercise its discretion to dismiss the state law claims after dismissing Plaintiffs' federal claims for failing to state a claim upon which relief can be granted. See Doc. No. 41 at 16–17. Because the Court finds that Plaintiffs have successfully stated federal claims, the Court shall exercise supplemental jurisdiction over the related state law claims.

alleged facts supporting the legal conclusion that the employees acted with malice, the employees'

motion to dismiss based on Public Official Immunity is denied.  See supra Parts II.E.ii, II.H.

Cleveland County's assertion of immunity requires a bit more discussion.  Absent waiver,

North Carolina counties enjoy governmental immunity from state tort claims arising out of their

performance of governmental functions.  See Patrick v. Wake County Dep't of Human Servs., 655

S.E.2d 920, 923 (N.C. Ct. App. 2008).  Because child abuse investigations are governmental in

nature, counties are normally "immune from liability for injuries caused by negligent social

services employees working in the course of their duties."  Hare v. Butler, 394 S.E.2d 231, 235

(N.C. Ct. App. 1990).  Even so, a county may waive its immunity by purchasing liability insurance.

See N.C. Gen. Stat. § 153A–435.  Such a waiver "may not be lightly inferred" and "must be strictly

construed."  Guthrie v. N.C. State Ports Auth., 299 S.E.2d 618, 627 (N.C. 1983).

Cleveland County asserts this case is materially indistinguishable from that considered by

the North Carolina Court of Appeals in Ballard v. Shelly, 811 S.E.2d 603, 606–07 (N.C. Ct. App.

2018).  There, a county moved to dismiss a claim, submitting an affidavit from its risk manager

that its insurance policies included a self-insured retention amount of $350,000 that must be paid

by the county before coverage is triggered.  See id. at 606.  The county also submitted pertinent

policy provisions, which indicated that the insurer was not obligated to pay "until the [county]

itself has paid in full the entire amount of its retained limit."  Id.  Without objection to this

uncontroverted evidence, the trial court granted the county's motion to dismiss.  Id.

On appeal, the plaintiffs argued "they were afforded no discovery into the terms of the

policy" and thus were not provided an "opportunity to fully develop the record."  Id. at 607.  The

Court ruled against the plaintiffs, noting there was not "any evidence in the record that they asked

for the opportunity to conduct discovery on this issue."  Id. (emphasis in original).  The Court thus

reasoned that it could not "fault the trial court for deciding this issue based on an uncontested affidavit received without objection." Id. (emphasis added).

While Cleveland County attempts to use Ballard as its shield, it does more harm for its argument than good. As Plaintiffs here recognize, the county seemingly failed to produce the entirety of its insurances policies, instead producing individual provisions. Plaintiffs thus ask for discovery to proceed on the issue of governmental immunity. See Doc. No. 51 at 17. Following the guidance of the state appellate court on this state-law immunity issue, the Court will allow limited discovery on this claim to determine whether Cleveland County has waived governmental immunity. Cleveland County may thus re-raise its governmental immunity claim at a later time.

In a final effort to dismiss the tort claims, Defendants briefly assert that the claims fail on their merits. But Defendants' arguments on this front fail to construe the evidence in the light most favorable to Plaintiffs. First, the DSS employees argue that absolute immunity applies to the defamation claims because they "investigated facts, [drew] conclusions from them, and [took] official action based upon their conclusions." Doc. No. 37 at 24. As discussed, Plaintiffs allege that Defendants' actions were not based on evidence, but were taken intentionally, in spite of potentially exculpatory evidence. See supra Part II.H. Similarly, Defendants allege the defamation claims should fail because they solely "shared information . . . within their functions as social workers." Doc. No. 37 at 24. Again, construing the allegations in the light most favorable to Plaintiffs, there are countless assertions that Defendants were not acting within their official functions as social workers. See supra Parts I, II.E., II.H. And finally, Defendants contend that the abuse of process claim fails because there was no evidence of an ulterior motive. Doc. No. 37 at 24. Again, at this stage, the Court takes all allegations in the light most favorable to Plaintiffs. Plaintiffs certainly allege an ulterior motive. See generally supra Parts I, II.H.

28

ii.    <u>North Carolina Constitution Claims</u>

Much like the United States Constitution, the North Carolina Constitution provides: "[n]o person shall be taken, imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner deprived of his life, liberty, or property, but by the law of the land." N.C. Const. art. I, § 19.  State courts have placed a "long-standing emphasis on ensuring redress for every constitutional injury." <u>Craig v. New Hanover Cty. Bd. of Educ.</u>, 678 S.E.2d 351, 357 (N.C. 2009).  Thus, where there is otherwise an absence of an adequate state remedy, an individual whose constitutional rights have been violated may assert a direct claim against the State under the North Carolina Constitution.  <u>See</u> <u>Corum v. Univ. of N. Carolina through Bd. of Governors</u>, 413 S.E.2d 276, 289 (N.C. 1992).  Two points follow from this rule.  First, because there must be an adequate remedy for constitutional injuries, sovereign immunity cannot serve as a complete bar to redress.  <u>See</u> <u>Craig</u>, 678 S.E.2d at 356.  And second, if there is an adequate remedy, the constitutional claim must "bow to established claims and remedies." <u>Corum</u>, 413 S.E.2d at 291.

The foregoing begs the question: what remedies are adequate to redress a constitutional injury?  Well, the plaintiff "must have at least have the opportunity to enter the courthouse doors and present his claim." <u>Craig</u>, 678 S.E.2d at 355.  Moreover, the presented claim must rest on the same facts that formed the basis of the direct constitutional claim.  <u>See</u> <u>id.</u>  Still, a remedy is not necessarily inadequate because it requires a higher burden of proof or a lesser recovery than the plaintiff would prefer.  <u>See</u> <u>Corum</u>, 413 S.E.2d at 291 (recognizing the state constitution merely guarantees "the least intrusive remedy available and necessary to right the wrong"); <u>Taylor v. Wake Cty.</u>, 811 S.E.2d 648, 655 (N.C. Ct. App.) (recognizing a common-law tort claim was not inadequate simply "because the plaintiff would have to show that the defendant 'acted with malice,

corruption, or beyond the scope of his duty'"), appeal dismissed, review denied, 819 S.E.2d 394 (N.C. 2018), reconsideration dismissed, 822 S.E.2d 646 (N.C. 2019).

North Carolina courts have identified at least two adequate remedies that Plaintiffs can exercise here.  First, they have recognized that common-law individual capacity claims may serve as an adequate state remedy precluding a state constitutional claim.  See Rousselo v. Starling, 495 S.E.2d 725, 732 (N.C. Ct. App. 1998); see also Bailey v. Town of Beaufort, No. 4:19-CV-60, 2019 WL 6702651, at *7 (E.D.N.C. Dec. 6, 2019).  As discussed above, Plaintiffs may proceed with those individual capacity state law claims in this case.  See supra Part II.I.i.  Second, state courts have recognized that claims asserted under the Tort Claims Act against the DSS before the North Carolina Industrial Commission serve as an adequate state remedy precluding a state constitutional claim.  See Taylor, 811 S.E.2d at 657–58.  And here, public records in fact show that Plaintiffs have asserted such a claim.  See Doc. No. 34-3 at 3.  In sum, because state law provides other adequate remedies, Plaintiffs' state constitutional claims must bow to those remedies.

## III.    CONCLUSION

As the foregoing analysis shows, Plaintiffs' path to success in this lawsuit is narrow and focused, and many of their allegations are insufficient to afford a federal or state cause of action.  Still, at a minimum, the Due Process Clause ensures that the State will not arbitrarily label parents as abusers and neglecters without at least considering contrary evidence.  Because Plaintiffs allege this happened to them, Defendants' contentions cannot warrant wholesale dismissal at this time.  Accordingly, Defendants' Motions to Dismiss shall be denied in part.

**ORDER**

**IT IS, THEREFORE, ORDERED** that the Motions to Dismiss for Failure to State a Claim—filed by Cleveland County (Doc. No. 44), the DSS employees (Doc. No. 34), and Johnny White (Doc. No. 40)—are **GRANTED** as to Plaintiffs' North Carolina Constitution claims, but **DENIED** as to Plaintiffs' remaining claims. The DSS employees' Motion to Dismiss for Lack of Subject Matter Jurisdiction (Doc. No. 38) is **DENIED.**

Signed: April 7, 2020

Max O. Cogburn Jr.
United States District Judge